IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Thomas K. Ziegler, | Case No. 3:04 CV 7302 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Findlay Industries, Inc., et al., | |
| Defendants. | |

Plaintiff makes four claims: negligent misrepresentation, unjust enrichment, violation of Ohio Rev. Code § 1701.93, and breach of good faith. This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(a). The amount in controversy exceeds $75,000 exclusive of interest and costs, and the parties are citizens of different states.

**FACTS**

Findlay Industries, Inc. is a privately held company headquartered in Ohio that provides parts to the auto industries in the United States, Mexico and Europe. In 2002, Findlay experienced financial difficulties and undertook a number of corrective actions. One such action was to hire an independent Chief Executive Officer who would report exclusively to the Board of Directors.

Plaintiff Thomas Ziegler is a licensed attorney and experienced businessman (Ziegler Dep. 9, 13). Defendants are Findlay Industries, Inc. (Findlay); Findlay Industries, Ltd., an alter ego of Findlay; three trusts which privately own Findlay; the estate of Philip D. Gardner, an owner, Director and employee of Findlay and a trustee of the three trusts mentioned above; and four individuals who have been or are owners, Directors, employees of Findlay or trustees of the trusts.

Prior to his employment with Defendants, Plaintiff practiced as an intellectual property attorney and served as an officer of another automotive supplier (Ziegler Dep. 11-12). While living in Florida, Plaintiff learned about the position at Findlay through BBK, Limited, a consulting firm that "advises financially distressed companies primarily in the automotive sector" (Ziegler Dep. 15, 103). Plaintiff understood that "the company had had some troubles in the past, that it had been recently refinanced and was in good shape and was in need of new management" (Ziegler Dep. 15).

In August 2002, Plaintiff began the interview process and the negotiation of his terms of employment. Plaintiff negotiated his own severance package. Defendants did not want to give more than six months while Plaintiff wanted two years of severance pay (Def.'s Mot. Summ. J. Ex. 3-4). They eventually settled on twelve months' severance and benefits, a term suggested by Plaintiff (Def.'s Mot. Summ. J. Ex. 4; Ziegler Dep. vol. II, 7).

During the negotiation process, Defendants provided Plaintiff with financial documentation that was prepared and distributed to all candidates for the position (Reinhart Dep. 85, 168). Plaintiff requested additional financial information, but Defendants labeled some of the requests as confidential and refused to provide it to Plaintiff. Plaintiff also claims he was told there was no negative information and that the company was in "good financial shape" (Ziegler Dep. vol. II, 70). However,

2

Plaintiff did receive financial statements prepared for Defendants' lending institutions as well as budget forecasts (Ziegler Dep 39-40).

In October 2002, Plaintiff signed an employment agreement with Defendants (Def.'s Mot. Summ. J., Ex. 8 (Agreement)). The pertinent terms and conditions of the Agreement are as follows:

> 1. Term. The Company will employ CEO for a period of three years commencing on October 15, 2002 and ending in October 14, 2005 ("Initial Term") as Chief Executive Officer. Upon the expiration of the base term of the Agreement, the Agreement shall be extended on a year to year basis unless the Company or the CEO gives the other party to this Agreement at least ninety (90) days notice that the Company or the CEO intends not to renew.
> . . .
>
> 7. Termination.
> . . .
>
>> c. Termination by the Company.
>> . . .
>>
>>> ii. The Company may terminate this Employment Agreement without cause at any time, but in such event the CEO shall be entitled to receive his base salary and fringe benefits (including medical and other insurance coverage's [sic]) for a period of time expiring upon the first to occur of (a) the termination of the term of the Employment Agreement, or (b) twelve (12) months from the date of termination.
>>
>> d. Termination by CEO. In the event the CEO voluntarily terminates his employment with the Company during the term of the Employment Agreement, the CEO's compensation shall be terminated immediately.

Approximately three weeks later, Defendants announced Ziegler's position as CEO (Ziegler Dep. 86). During his employment, Plaintiff became aware of financial improprieties within the company and that it faced a "serious liquidity crisis in the near future" (Ziegler 70, 72; Seydlitz Dep. Ex. 6, vol. II). Plaintiff also had a difficult time working with Gardner and other officers of the company. Plaintiff felt that he did not have the responsibilities and control that went with his position as CEO (White Dep. 71; Ziegler Dep. 107, 122, 133), and allegedly was denied the authority to "run

3

certain segments of the business consisting of the truck operations, hiring and firing of people, the service operations and other facets of the business" (Ziegler Dep. vol. II, 31, 62).

The conflict between Plaintiff and Gardner was particularly acute. Gardner would yell at Plaintiff for not keeping him informed, going behind his back, and interfering with Reinhart's operations (Ziegler Dep. 165). On one particular occasion, Gardner accused Plaintiff of "trying to destroy the company, trying to sell the company, trying to tear the company apart, [and] trying to go behind [Gardner's] back" (Ziegler Dep. 159-160). Additionally, on multiple occasions, Gardner asked Plaintiff to resign, which Plaintiff ignored, and Gardner threatened to fire Plaintiff if he did not fire certain employees and retain others (Ziegler Dep. vol. II, 39-40, 63-64; Fahl Dep. 29).

Despite these alleged difficulties, Plaintiff was able to perform many of his official duties, tend to important business issues, meet with lenders, insolvency counsel and investment bankers, hire a new CFO, implement changes that significantly improved the financial position of Findlay, as well as plan and begin the process of selling the European assets for which Mike Alexander, his eventual successor, was given a $1.8 million bonus (Pl.'s Opp. Ex. A; Ziegler Dep. 97).

In February 2003, Gardner told Ziegler that he was fired and two days later the Board voted to terminate his employment. Plaintiff was terminated because he was not communicating with Gardner, he hired a law firm without Board approval, and he did not replace a sales representative (Fahl Dep. 42-43; M. Gardner Dep. 70). Plaintiff continued to receive a salary and benefits for one year following his termination, as provided for in the Agreement. Plaintiff received $701,342, excluding benefits, for his four months of employment with Defendants (Anez Aff. ¶4).

Plaintiff commenced this action on May 20, 2004 and in August 2005 Judge Katz dismissed two counts from the Complaint (Doc. Nos. 1, 20). Plaintiff filed his Amended Complaint (Doc. No.

4

25) which retained the count for Intentional Fraud for purposes of appeal. Leave to file a Second Amended Complaint was granted in March 2006 (Doc. No. 52), the Second Amended Complaint (Doc. No. 53) was filed the same month, and in April 2006, the case was reassigned to Judge Zouhary (Doc. No. 55).

## SUMMARY JUDGMENT STANDARD

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Id.* When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

## NEGLIGENT MISREPRESENTATION

"No court in Ohio has held the tort of negligent misrepresentation applicable to the employer-employee relationship." *Vickers v. Wren Industries, Inc.*, No. Civ.A. 20914, 2005-Ohio-3656, at ¶47 (Ohio Ct. App. 2005); *see also Nichols v. Ryder Truck Rental, Inc.*, No. CV-215168, 1994 WL 285000, at *4 (Ohio Ct. App. June 23, 1994) ("The business transactions of the alleged injured party are usually those involving lease or insurance agreements. . . . No court in Ohio, however, has held the tort of negligent misrepresentation applicable to the employer-employee relationship). "Ohio

courts have demonstrated a willingness to extend liability for negligent misrepresentation only in special cases." *Bellios v. Victor Balata Belting Co.*, 724 F. Supp. 514, 519 (S.D. Ohio 1989).[1]

Even if such a claim were recognized in Ohio, Plaintiff's claim fails to meet the required elements. "A core requirement in a claim for negligent misrepresentation is a special relationship under which the defendant supplied information to the plaintiff for the latter's guidance in its business transaction." *Hayes v. Computer Assoc. Inc.*, No. 03:02 CV 7452, 2003 WL 21478930, at *6 (N.D. Ohio June 24, 2003) (unreported). "This relationship occurs only in 'special' circumstances. Usually the defendant is a professional (e.g., an accountant) who is in the business of rendering opinions to others for their use in guiding their business, and the plaintiff is a member of a limited class. This 'special' relationship does not exist in ordinary business transactions." *Id.* Those "who are in the business of supplying information for the guidance of others typically include attorneys, surveyors, abstractors of title and banks dealing with non-depositors' checks." *Nichols*, 1994 WL 285000, at *4 (citing *McCarthy, Lebit, Crystal & Haiman Co., L.P.A. v. First Union Mgmt., Inc.*, 87 Ohio App. 3d 613 (1993)).

---

[1] Two reported Ohio cases have considered a negligent misrepresentation claim in the employer-employee context. However, in each case, the court found that the negligent misrepresentation claim failed, and neither court addressed whether the application of the negligent misrepresentation claim to the employer-employee relationship was proper. *Baker v. Northwest Hauling*, No. WD-02-050, 2003-Ohio-3420 (Ohio Ct. App. 2003); *Brainard v. City of Toledo*, 118 Ohio Misc. 2d 158 (Lucas Cty Comm. Pl. 2001). Other federal courts have indicated that negligent misrepresentation in an employer-employee relationship is not a recognized cause of action in Ohio. *Bellios*, 724 F. Supp. at 519 (stating it had a "deep apprehension" about the application of negligent misrepresentation in an employer-employee relationship); *Comer v. ENSR Operations*, Civ.A. No. 2:93-0317, 1994 WL 800274, at *10-11 (S.D.W.Va. Aug. 5, 1994) (stating that *Nichols* was instructive on Ohio's treatment of negligent misrepresentation in an employer-employee setting, and that it "is at least highly doubtful that Ohio law would sanction a negligent misrepresentation claim in the context of this action"). In light of Ohio's policy to extend this cause of action only in special cases, the absence of case law recognizing the cause of action, and the inapplicability of Ohio's "special relationship" definition to employer-employee relationships, this Court agrees that Ohio courts have not and would not recognize a negligent misrepresentation claim in an employment-at-will context.

The arms-length transaction in the instant case is not the type of "special relationship" covered by negligent misrepresentation. Plaintiff alleges that the individual Defendants supplied false or misleading information to him during the hiring process. Even if these individuals supplied such misinformation, their acts on behalf of Findlay do not create the "special relationship" required under Ohio case law.

Alternatively, Plaintiff claims that Gardner's statements that Findlay was in "good financial shape" created a separate duty to speak truthfully. These statements, standing alone, are mere puffery and do not create a fiduciary duty under Ohio law. *Warren v. Percy Wilson Mortg. & Fin. Corp.*, 15 Ohio App. 3d 48, 51 (1984). Moreover, an optimistic "spin" by Gardner must be viewed in conjunction with all the other more specific financial information made available to Plaintiff, along with the unlimited opportunity to speak to other officers and directors. Plaintiff was well aware of the recent financial difficulties of Findlay -- indeed, that was the reason he was approached about this position. He knew he was making a decision in a partial vacuum, yet willingly contracted with Defendants. Plaintiff was in a position to take all the relevant circumstances into consideration when he negotiated his employment agreement.

For each of these reasons, this claim is dismissed.

### UNJUST ENRICHMENT

A claim of unjust enrichment requires Plaintiff to show: (1) a benefit conferred by Plaintiff upon Defendants; (2) knowledge by Defendants of the benefit; and (3) retention of the benefit by Defendants in circumstances where it would be unjust to do so without payment. *Hambleton v. R.G. Barry Corp.*, 12 Ohio St. 3d 179, 183 (1984).

Plaintiff fails to meet the third requirement for an unjust enrichment claim -- the unjust retention of benefits by Defendants. Plaintiff claims that "Defendants enjoyed a great windfall as a direct result of Mr. Ziegler's efforts, while Mr. Ziegler himself was left with a damaged reputation and without employment" (Pl.'s Opp. 12). Yet, Plaintiff negotiated and voluntarily signed an agreement for an "early" termination of his employment with specified payments. Plaintiff clearly knew he was an at-will employee, subject to termination with or without cause, and on termination he was to receive an additional year's salary as compensation. Plaintiff recognized that twelve months "would be a totally fair compromise" considering the circumstances (Def.'s Mot. Summ. J. Ex 4). Defendant Findlay did not receive any benefit for which it did not compensate Plaintiff with valuable consideration pursuant to a freely negotiated contract. *See Brainard*, 118 Ohio Misc. 2d at 166 (where contract worker agreed to and did provide services to the city, and was compensated for her work, the city was not unjustly enriched); *Vickers*, 2005-Ohio-3656, at ¶62 (plaintiff who admitted he was compensated for every hour he worked while employed did not show defendant/employer was unjustly enriched). The suggested "windfall" to Defendants is nothing more than the profits from the improved financial performance of the company. Plaintiff admits he received full payment under the Agreement he negotiated. This claim is an attempt to renegotiate that Agreement and Defendant Findlay is entitled to summary judgment.

## OHIO REVISED CODE § 1701.93

Plaintiff fails to address this claim in his Memorandum in Opposition, effectively conceding this claim, and fails to set forth specific facts showing a genuine issue for trial. Summary judgment is therefore granted.

**BREACH OF CONTRACT**

Under Plaintiff's breach of contract claim (Count 5), Plaintiff claims that Defendants committed two breaches: breach of the plain contract terms and breach of Defendants' duty of good faith and fair dealing.

Plaintiff asserts that Defendants breached the plain contract terms wherein they acted in bad faith by failing to give him the full rights and responsibilities of a CEO, as provided for in Clause 2 of the Agreement.[2] As explained in detail below, this claim is inseparable from Plaintiff's breach of duty of good faith and fair dealing claim. Accordingly, both claims are discussed together.

A breach of contract claim requires Plaintiff to establish four essential elements: (1) the existence of a contract; (2) performance by Plaintiff; (3) breach by Defendants; and (4) damage or loss to Plaintiff. *Doner v. Snapp*, 98 Ohio App. 3d 597, 600-01 (1994) (affirming summary judgment on breach of contract claim where Plaintiff failed to show damages). Here, viewing the evidence most favorable to Plaintiff, Plaintiff can show no damages.

The principal allegations are: Gardner and Reinhart "bad mouthed" Ziegler and tried to undermine him; Reinhart reported to Gardner directly bypassing Ziegler; and Ziegler "felt" he never had the authority of a CEO.

---

[2] Ohio does not recognize a duty of good faith and fair dealing in "wrongful discharge cases brought by at-will employees." *Kuhn v. St. John & West Shore Hosp.*, 50 Ohio App. 3d 23, 25 (1989); *Staffilino Chevrolet, Inc. v. Balk*, 158 Ohio App. 3d 1, 13 (2004) ("at will" means that the employee can be terminated for cause or no cause at all; an at-will employee can be terminated for an unfair reason and thus, generally, there can be no wrongful discharge of an at-will employee). However, Ohio has recognized that, outside of the termination of an at-will employee, the "standard of good faith is required of every contract, including employment contracts." *Littlejohn v. Parrish*, 163 Ohio App. 3d 456, 462-63 (2005). While breach of a duty of good faith and fair dealing is not an independent claim, it can be raised as part of a breach of contract claim. *Id.* at 463; *Thomasville Furniture Indus. Inc. v. JGR, Inc.*, 3 Fed. Appx. 467, 472-73 (6th Cir. 2001) (unreported).

Under Ohio law, "[g]ood faith is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Ed Schory & Sons, Inc. v. Francis*, 75 Ohio St. 3d 433, 443-44 (1996) (quoting *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357-58 (7th Cir. 1990)). In *Littlejohn*, the court held, "[a]ny agreement . . . has an implied covenant of good faith and fair dealing that requires not only honesty but also reasonableness in the enforcement of the contract." *Littlejohn*, 163 Ohio App. 3d at 462; *Florence Urgent Care v. HealthSpan, Inc.*, 445 F. Supp. 2d 871, 879 (S.D. Ohio 2006).

Plaintiff argues he was not given, in good faith, "the general powers and duties of management usually vested in the office of a chief executive officer of a corporation" (Agreement ¶2).[3] Plaintiff ignores however that the Agreement also authorized the Board to ultimately define his "powers and duties" and never guaranteed the unlimited authority he now claims. Therefore, Plaintiff's inability to hire and fire people without approval of others and his lack of control over all of the company operations is not a clear deprivation of his promised powers and duties, especially when Plaintiff must have wielded enough authority to claim credit, as he does, for Defendants' improved financial situation. The record indisputably indicates personality conflicts between Plaintiff and Gardner -- "it was a two-way problem" (White Dep. 22). Plaintiff also complains about his treatment at the hands of Reinhart, an employee and close associate of Gardner (White Dep. 14). Plaintiff believed Reinhart, unhappy with Plaintiff's selection as CEO, felt threatened enough to try to undermine Plaintiff's

---

[3] "Duties. The duties of the CEO shall be to supervise, direct and control the business and the officers of the Company; have the general powers and duties of management usually vested in the office of a chief executive officer of a corporation; and have all other powers and duties as may be prescribed by the Board of Directors of the Company." (Agreement ¶2).

10

position (White Dep. 55-56, 71-72). However, personal insults by an officer who disagreed with Plaintiff's style of management do not establish a breach of good faith by Defendants bound in privity through the Agreement. Indeed, such a situation is precisely one type of scenario contemplated by the Agreement, which allowed either side to terminate the employment.

Viewing the evidence in a light most favorable to Plaintiff, he shows neither lack of good faith nor a recoverable loss. There was displeasure with Plaintiff's performance as CEO, and his successor, originally hired by Plaintiff, appears to have succeeded where Plaintiff failed. Plaintiff already received his full salary for the four months of employment plus a year's worth of salary and benefits pursuant to the Agreement. Plaintiff's alleged damages include the loss of (1) compensation for the remainder of employment under the Agreement, and (2) bonuses and other compensation that he would have earned if not terminated. But this recovery would negate the at-will Agreement negotiated and signed by Plaintiff.

Plaintiff's damages fail for three separate reasons. First, the damages for bonuses and compensation he would have received if he had continued are too speculative. *Wagenheim v. Alexander Grant & Co.*, 19 Ohio App. 3d 7, 17 (1983) (damages that result from an alleged wrong must be shown with reasonable certainty, and cannot be based upon mere speculation or conjecture) (citing *Rhodes v. Baird*, 16 Ohio St. 573, 580-81 (1866)). Plaintiff claims that "he was prevented from earning bonuses and other compensation that he would have earned had he not been fired. Specifically, had he not been terminated, [he] could have reasonably expected to earn the same compensation, approximately $2 million, awarded to [Alexander]" (Pl.'s Opp. 19). But, when Alexander replaced Plaintiff as CEO, Alexander negotiated **different** compensation and bonuses from what Plaintiff had negotiated (White Dep. Ex. 21). For example, Alexander negotiated and received

11

a bonus for his part in the sale of a European division of the company (Seydlitz Dep. 160-62). Plaintiff had not negotiated similar compensation, nor had he received any guarantees of bonuses or compensation on top of his salary.

Second, Plaintiff is essentially seeking damages for the loss of continued employment. Ohio law specifically rejects this type of recovery for at-will employees and recognizes that an at-will employee may be terminated for any reason, with or without cause, in good faith or bad faith.[4] *Mers v. Dispatch Printing Co.*, 19 Ohio St. 3d 100, 105 (1985); *Lake Land Empl. Group of Akron, L.L.C. v. Columber*, 101 Ohio St. 3d 242, 247 (2004) ("In the event that an at-will employee quits or is fired, he or she provides no further services for the employer and is generally entitled only to wages and benefits already earned.").

The Agreement states that Plaintiff may be terminated at any time, with or without cause, and he may voluntarily quit at any time. The Agreement explicitly awards Plaintiff twelve months of severance pay if he is terminated before the Agreement expires. Plaintiff asserts that the mere inclusion of a three-year term in the Agreement is sufficient to negate his at-will status. The Court disagrees. In Ohio there is a strong presumption of at-will employment unless the terms of the contract clearly indicate otherwise. *Henkel v. Educ. Research Council*, 45 Ohio St. 2d 249 (1976). "[T]he absence of a term which expressly states that the employment is at-will proves nothing."

---

[4] Ohio does not recognize a cause of action for breach of the covenant of good faith and fair dealing in employment-at-will agreements in the context of employee termination. *See Mers v. Dispatch Printing Co.*, 19 Ohio St. 3d at 105; *Hundley v. Dayton Power & Light Co.*, 148 Ohio App. 3d 556, 563-64 (2002); *Crawford v. ITT Consumer Fin. Corp.*, 653 F. Supp. 1184, 1193 (S.D. Ohio 1986) (Ohio has not recognized implied covenants of good faith and fair dealing in either written and oral at-will employment agreements). Plaintiff seeks to circumvent this rule of law by attempting to tie his inability to perform his duties with his eventual termination. However, the Record contains no such support. Rather, Plaintiff was terminated because he was not communicating with other officers and the Board and failed to follow Board instructions (Fahl Dep. 43; M. Gardner Dep. 70). Because neither the termination nor the damages arising out of termination can be ascribed to the alleged breach, Plaintiff fails to show compensable damages.

*Hawley v. Dresser Indus., Inc.*, 738 F. Supp. 243, 251 (S.D. Ohio 1990). "The identifying characteristic of an employment-at-will relationship is that either the employer or the employee may terminate the employment relationship for any reason which is not contrary to law." *Haynes v. Zoological Soc'y of Cincinnati*, 73 Ohio St. 3d 254, 258 (1995). Plaintiff, a lawyer and businessman, specifically negotiated his own contract and **admits** that he knew he could be terminated without cause or quit at any time (Ziegler Dep. vol. II, 7); *See Blount v. Smith*, 12 Ohio St. 2d 41, 47 (1967) ("[t]he right to contract freely with the expectation that the contract shall endure according to its terms is as fundamental to our society as the right to write and to speak without restraint. Responsibility for the exercise, however improvident, of that right is one of the roots of its preservation"). This Agreement, read in its entirety, clearly shows a presumptive three year employment term which was terminable at an earlier date by either party.

## CONCLUSION

While viewing the facts in a light most favorable to Plaintiff, he fails to establish the necessary elements of his claims and this Court finds no genuine issue as to any material fact. Therefore, Defendants are entitled to judgment as a matter of law. Defendants' Motion for Summary Judgment is GRANTED as to all Defendants.

IT IS SO ORDERED.

                                                                           s/ *Jack Zouhary*
                                                                     JACK ZOUHARY
                                                                     U. S. DISTRICT JUDGE

November 30, 2006